**FILED IN CHAMBERS**
**U.S.D.C. ROME**

Date: Jan 06 2021

JAMES N. HATTEN, Clerk

By: _s/Kari Butler_

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION FILE |
| BRYAN DAVID SOMERS, | NO. 4:20-CR-005-JPB-WEJ |
| Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Bryan David Somers's Motion to Suppress Statements and Phone [20] as amended [28].  On September 2, 2020, the Court conducted an evidentiary hearing [29] regarding these Motions, which has been transcribed [35].  Based on the evidence produced at the hearing and the briefs of counsel (see Def.'s Br. [37]; Gov't Resp. [38]), the undersigned **RECOMMENDS** that defendant's Motions [20, 28] be **DENIED**.

## I.   STATEMENT OF FACTS

### A.   Discovery of Child Pornography

The sole witness for the Government was U.S. Department of Homeland Security ("DHS") Special Agent ("SA") Shawn Owens.  (Tr. 2-3.)  He is the case agent for this matter and became involved as a result of a referral from a state

agency.  (Id. at 5.)  On June 25, 2019, Detective Brady of the Polk County Police Department, a member of the Internet Crimes Against Children Task Force, was searching for child sex abuse materials on the internet using an investigative version of the BitTorrent software[1] and employing either a keyword term or an info hash.[2]  (Id. at 6-7, 38-39.)  SA Owens was not sure whether Det. Owens was searching for a specific info hash or just located a specific info hash and checked it against those known to be attached to child pornography files.  (Id. at 8.)

_____

[1] BitTorrent is a peer-to-peer network that allows users to communicate with each other and share files of all types, such as music, software, or even child pornography.  (Tr. 6.)  A user who has a file stored on his computer can share that file with a another user's computer.  (Id.)  In a typical transaction, a user looking for a music album, for example, would search for it, and the software would reach out to all users who had made it available and obtain it from them all for a faster download.  (Id. at 6-7, 39-40.)  However, the investigative version of BitTorrent used by Agent Brady latches on to one particular user and downloads only from him.  (Id. at 7, 39-40.)  SA Owens subsequently clarified that, based on his limited knowledge of BitTorrent, Det. Brady actually downloaded from a single IP address, not a single user.  (Id. at 42-43; see also infra note 3, which discusses IP addresses.)  The information Det. Brady was able to obtain did not identify the type of device (i.e., computer or cellphone) from which the uploaded files came.  (Tr. 44.)  Thus, there was no way to determine if a device later seized was the source of the download.  (Id.)

[2] An info hash is similar to a fingerprint or serial number for a file.  (Tr. 7.)  An info hash can have one file or multiple files attached to it.  (Id.)  A file's info hash does not change unless the file is modified and renamed.  (Id.)  Because of this feature, law enforcement have been able to develop a database or list of info hashes that are known to contain child pornography files.  (Id.)

Regardless, the info hash that Det. Brady located contained 317 files.  (Id.)  Det. Brady was also able to determine the IP address of the computer that provided the download.  (Id. at 9.)[3]

Using a direct connection to the IP address of the device holding those files (see supra note 1), Det. Brady downloaded 11 of the 317 files.  (Tr. 8.)  The download occurred between 7:21 a.m. and 7:25 a.m. Eastern Time on June 25.  (Id. at 9-10.)  SA Owens reviewed those 11 files.  Based on his significant experience and training in combating child pornography, he determined that all of those files constituted child pornography as defined by federal law.  (Id. at 3-5, 8-9.)

Using that IP address located by Det. Brady, SA Owens ran open source checks and determined that this IP address was serviced by Comcast.  (Tr. 10.)  He then issued an administrative subpoena to Comcast, which responded that on June 25 the account owner's name was Bryan Somers, at 19 Corinth Road in Cartersville,

_____

[3] When an individual signs up for internet service, his internet service provider assigns an IP address to the router at his physical location.  (Tr. 9.)  An IP address identifies the router that is uploading and downloading internet traffic.  (Id. at 40.)  Multiple computers or devices can connect to a router.  (Id.)  Any computer or device connected to the internet through that router would have the same IP address.  (Id. at 40-41.)  Users can connect to a router via an ethernet cable or through a wireless "Wi-Fi" signal.  (Id. at 41.)

3

Georgia.  (Id. at 10, 61, 65-66.)  Comcast also provided a telephone number and an email address for the account.  (Id. at 10.)

SA Owens then employed both online and physical intelligence gathering techniques.  (Tr. 11.)  He learned that vehicles registered to 19 Corinth Road were owned by Bryan and Jennifer Somers, both of whom had valid drivers' licenses that listed 19 Corinth Road as their home address.  (Id. at 11, 30.)  His intelligence research specialist queried the Department of Labor's website using the Somers's dates of birth and Social Security numbers and determined that Mr. Somers was employed by Metro Atlanta Ambulance Service and the Bartow County School System.  (Id. at 11.)  SA Owens made contact with Metro Atlanta Ambulance Service and learned that Mr. Somers was not working on June 25.  (Id.)

SA Owens also conducted surveillance on 19 Corinth Road.  (Tr. 12.) Government Exhibits 3 [31-1] and 4 [31-2] are fair and accurate depictions of that address.  (Id.)  Exhibit 3 is a screen shot of a satellite view from Google reflecting the townhouses on Corinth Road where defendant lived.  (Id.)  There are two spots at the front door of 19 Corinth Road where residents may park.  (Id. at 12-13.)  Mr. Somers lived in the second townhouse from the left as pictured on the bottom of Government Exhibit 3.  (Id. at 13.)  Government Exhibit 4 depicts the front door and parking area for 19 Corinth Road.  (Id.)

4

**B.    The Search Warrant**

SA Owens next obtained a federal search warrant on July 18, 2019.  (Tr. 13-14; see also Gov't Ex. 8 [31-5], at 1 (search warrant).)  The location to be searched (19 Corinth Road in Cartersville, Georgia) was described in Attachment A to the search warrant and referred to as the "subject premises."[4]   The property, information and data "concealed" on the subject premises was described in Attachment B, which began its description of the items to be "seized and searched" with the following preamble:

> The following items, located at 19 Corinth Road Cartersville, GA 30121, to include any and all structures, outbuildings, vehicles and recreational vehicles, that constitute contraband or evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 2252:

---

[4] Attachment A to the search warrant provides as follows:

> The SUBJECT PREMISES is located at 19 Corinth Road Cartersville, GA 30121.  This Residence is an attached Townhouse that is located on Corinth Road in a shared parking lot with several other units.  The parking lot is located in the right-hand side of the road prior to reaching the Corinth Baptist Church.  The Subject Premises is a townhouse with red brick around bottom level and off-white siding covering the remainder of the building.  There is a small overhang over the front door and a white garage door.  The molding around the single garage door bears a small "19".

(Gov't Ex. 8 [31-5], at 2.)

5

(Gov't Ex. 8 [31-5], at 3; <u>see also</u> Tr. 18, asserting that the warrant allowed for the search of vehicles.)  Following this preamble were 16 specific paragraphs of items for which agents could search and seize, which included, <u>inter alia</u>, child pornography, computers, and cellular telephones.  (<u>Id.</u> at 4, ¶¶ 1, 12; <u>see also</u> Tr. 30, asserting that the warrant allowed for the search of cellphones and other electronic devices.)

### C.    Execution of the Search Warrant

On July 19, 2019, SA Owens, Det. Brady, three or four DHS agents, one GBI special agent who was a member of the DHS task force, and four or five deputies from the Bartow County Sheriff's Office, executed the search warrant. (Tr. 14-15.)  The special agents wore tactical attire (bulletproof vests and outer garments marked with law enforcement insignia), while the deputies wore standard uniforms and drove marked cars.  (<u>Id.</u> at 15.)  All law enforcement personnel were armed; those who were to encounter Mr. Somers wore side arms; others carried a mix of side arms and long arms.  (<u>Id.</u> at 15-16.)

Those executing the search warrant began arriving at 19 Corinth Road shortly before 6:00 a.m.  (Tr. 16, 44.)  SA Owens testified that when he arrived, he noticed a light on in the residence with three vehicles parked out front.  (<u>Id.</u> at 16.) He had been aware of two of the vehicles from the prior research—a Ford F-150

and a Jeep Cherokee; they were parked parallel to each other outside the front door of the residence.  However, the third vehicle, a Toyota Corolla, was parked behind the pickup and against the street curb.  (Id. at 16-17, 46.)  Based on the defendant's work schedule, SA Owens had a good idea of when the defendant might leave home for work.  (Id. at 16.)  For the safety of all involved, those executing the warrant elected to encounter Mr. Somers outside of his residence.  (Id. at 17-18.)

SA Owens observed Mr. Somers leave the residence at about 6:15 a.m., wearing some sort of uniform and carrying some small items.  (Tr. 17, 45.)  When Mr. Somers was four to five feet from the driver's side door of the Corolla (which he was apparently intending to drive that morning), SA Owens activated the blue lights of his vehicle and announced, "Police."  (Id. at 18, 46.)  Mr. Somers immediately stopped where he was and put up his hands.  (Id. at 18, 46.)  Bartow County Deputy Fleming arrived at about this time and pulled his marked vehicle into a position that blocked the Corolla from departing.  (Id. at 19, 45.)  SA Owens and Resident Agent in Charge Webb approached Mr. Somers.  (Id. at 45.)  The other officers concentrated on their anticipated entry into the home.  (Id.)

SA Owens again identified his entourage as police and explained to Mr. Somers that they there to execute a search warrant.  (Tr. 19.)  When SA Owens asked if anyone was in the residence, Mr. Somers replied either "yes" or that his

7

wife and kids were inside.  (Id.)  SA Owens and any agents or deputies who made direct contact with Mr. Somers had their weapons holstered.  (Id.)  SA Owens testified that he did not raise his voice at the defendant.  (Id.)  SA Owens asked for, and Mr. Somers provided, a key to the residence so that the entry team would not have to breach the door.  (Id. at 21.)

SA Owens could see that Mr. Somers had keys and a cell phone in his hands. (Tr. 20.)  The agent placed his hand on Mr. Somers's wrist and told him that he was not under arrest, but that he was being detained.  (Id.)  Mr. Somers placed his keys and cell phone on the roof of the Corolla and SA Owens placed handcuffs on him within seconds of their initial encounter.  (Id. at 20, 46-47.)  Agents detained Mr. Somers for safety—law enforcement personnel were entering the residence; the defendant was in the immediate area; and one never knew how someone in that hectic situation might react.  (Id. at 20.)[5]  SA Owens directed his flashlight into the Corolla and noticed a pistol in the center console and a long knife in the floorboard. (Id.)  SA Owens patted Mr. Somers down to see if there were any additional

_____

[5] SA Owens further testified that Mr. Somers was not allowed to drive off in the Corolla because vehicles were to be searched under the warrant.  (Tr. 63.) Moreover, officer safety required his detention because he could have used the car as a weapon.  (Id. at 64.)

8

weapons on his person (but there is no mention that he found any). (Id. at 20, 47.)
Regardless, once Mr. Somers was patted down, nothing would have remained in
his pockets. (Id. at 47-48.)[6]

At this point, SA Owens escorted Mr. Somers over to a nearby marked
Bartow County Sheriff's vehicle, handed him over to Deputy Fleming, and asked
the Deputy to keep him there while he (SA Owens) went inside to check on the
entry team. (Tr. 20-21, 48-50.) Mr. Somers's cell phone and keys were taken over
to the marked vehicle with him and placed on either its roof or hood. (Id. at 21,
51.) Mr. Somers stood outside the marked vehicle. (Id. at 49.)

In the meantime, officers had entered the residence. (Tr. 21.) They called
out for Ms. Somers, who came to the top of the stairs. (Id.) The officers brought
her out of the residence and to one side (apparently away from Mr. Somers). (Id.)
When asked if anyone else was in the house, Ms. Somers replied that her two
children were. (Id.) Officers encountered the two children (ages 8 and 9) in
bunkbeds in an upstairs bedroom and left them there while the residence was
cleared. (Id. at 22.) Once it was deemed safe, the children were directed to dress

---

[6] SA Owens could not recall if Mr. Somers's wallet was one of the items
removed from his pockets. (Tr. 47, 57.)

and join Ms. Somers outside.  (Id.)  The children were remarkably calm and were heard laughing with the officers.  (Id.)  SA Owens remarked that Ms. Somers did not cry or scream, but he could not tell whether she was upset.  (Id.)  SA Owens took a quick walk through the residence after it was cleared, then gathered SA Greene and Investigator LaFrance and told them that he was going to go talk to Mr. Somers.  (Id. at 22, 50.)  SA Owens was in the residence no more than five minutes. (Id. at 50.)

### D.   Interview of Mr. Somers at the Residence

SA Owens walked outside and over to where Ms. Somers was being detained near the marked vehicle.  (Tr. 23, 50.)  He explained again why the officers were at his residence, told him that he was not under arrest and free to go, stated that the handcuffs were about to be removed, and asked if he would be willing to talk.  (Id. at 23, 51.)  He replied that he would be willing to talk.  (Id. at 23.)  No one had pointed a weapon at Mr. Somers, yelled at him, threatened him, or made any promises to him.  (Id.)  Deputy Fleming removed the handcuffs.  (Id. at 23, 52.) SA Owens suggested that they go in the house and talk.  (Id. at 62.)

As SA Owens and Mr. Somers were gathering up the defendant's personal items, SA Owens noticed the cellphone and remarked that he did not remember who owned it.  (Tr. 24.)  Mr. Somers replied that it belonged to him.  (Id.)  The

10

defendant asked if he could make a call to let his employer know that he would be late or not be in at all.  (Id. at 24, 56.)  SA Owens replied in the affirmative, but asked Mr. Somers if he could make the call upstairs where it would be quiet, and he agreed.  (Id. at 24.)[7]  Mr. Somers, SA Owens, GBI SA Greene, and Investigator LaFrance then walked into the house and into an upstairs bedroom across from the master.  (Id. at 24, 52.)  A chair was rolled into the bedroom and Mr. Somers was asked to take a seat if he wanted to, and he did.  (Id. at 24, 54.)  The door to the bedroom was closed; the three officers stood at least three feet from the defendant in this standard size bedroom, in a relaxed posture; no one engaged in threatening physical gestures or in non-verbal intimidation.  (Id. at 53-55, 65.)

The interview then began and was audio recorded.  (Tr. 24-25; see also Gov't Ex. 1 (copy of audio recording).)  SA Owens first provided Mr. Somers with the Miranda warnings and wavier using an agency form.  (Tr. 25-26; see also Gov't Ex. 9 [31-6] (copy of ICE Form 73-025).)  SA Owens noted yet again to Mr. Somers that he was not under arrest and that he was free to leave.  (Tr. 25-26.)  Mr. Somers also read the form and signed it.  (Id. at 26.)  No threats or promises were made to

---

[7] After Mr. Somers made the call, the officers took possession of his phone. It was not returned to him.  (Tr. 56-57.)  In other words, it was seized.  (Id. at 30.)

11

Mr. Somers to induce him to sign the form.  (Id.)  The officers' side arms were visible but holstered.  (Id. at 55.)  Mr. Somers then talked to the agents and at no time asked to end the interview.  (Id. at 26.)  He also never asked to speak to an attorney.  (Id. at 27.)

During the interview, Mr. Somers remarked that he was scared his words would be skewed, and he was uncertain if he wanted to talk more, but he never made the affirmative statement that he did not want to talk.  (Tr. 27.)  He was never told that he had to speak to the agents.  (Id.)  Mr. Somers also relayed that he constantly used the computer and built and loaded operating systems.  (Id. at 31.)  Mr. Somers also stated that he periodically locked and unlocked the security on his router.  (Id.)[8]

Eventually, Mr. Somers stated that he did not know if he wanted to speak any more, so the agents ended the interview and stated they were going to interview Ms. Somers.  (Tr. 27.)  Mr. Somers asked whether he was going to be arrested; SA Owens replied that the decision had not yet been made and would depend on what

─────────────────────

[8] This means that Mr. Somers removed password protection from the router. (Tr. 41.)  When he did so, anyone within range of the router's Wi-Fi signal could connect to the internet using that router.  (Id.)  In other words, if password protection is off, a neighbor might be able to get on the defendant's router and access his internet connection.  (Id. at 42.)

was found at the residence.  (Id. at 27-28, 55.)  The officers then escorted Mr. Somers downstairs, where he took a seat on a couch.  (Id. at 57.)  He waited there while the warrant was being executed and never asked to leave and was never told that he could not do so.  (Id. at 65.)

During the search of the residence, a computer forensic agent conducted a preview of the home's computer.  (Tr. 29.)[9]  He found within the computer's recycle bin folders and linked files showing a history of the presence of child sexual abuse material.  (Id. at 29-30.)  Agents thus seized the computer.  (Id. at 30.)

When agents interviewed Ms. Somers, she stated that the family had access to the computer and that she had a password to it.  (Tr. 30.)[10]  However, she relayed that her use of the computer was limited to viewing pictures from her time in the military and of her children.  (Id.)  Ms. Somers claimed to be unsavvy when it came to technology and using a computer.  (Id.)  Although not mentioned in the hearing transcript, Investigator LaFrance's affidavit in support of a search warrant for Mr. Somers's cellphone (discussed infra) states that Ms. Somers relayed that Mr.

_____

[9] Government Exhibits 5 [31-3] and 6 [31-4] reflect the computer located in the residence's master bedroom.  (Tr. 28-29.)

[10] SA Owens, Investigator Lafrance, and GBI SA Greene interviewed Mrs. Somers in the same upstairs bedroom that had used to interview her husband.  (Tr. 57.)

Somers would on occasion take photographs of his step-children while they were naked using his cellphone.  (Gov't Ex. 10 [31-7], at ¶ 14.)

### E.    The Arrest of Mr. Somers

Computer forensics agent continued reviewing the computer and found approximately 1400 files of suspected child pornography.  (Tr. 31.)  The agent based this conclusion on the folder names (one was actually called, "child porn") and identifiers on other files listing the age range of the children pictured therein and descriptions of the illicit acts being performed.  (Id. at 31-32.)  The forensics agent eventually opened a file and viewed it (which apparently confirmed that its content was child pornography).  (Id. at 32.)

After consulting with GBI SA Greene and Investigator LaFrance, SA Owens determined that there was probable cause to arrest Mr. Somers for charges related to child pornography and notified him of that fact.  (Tr. 31-32.)  The defendant was also informed that he would be transported to the Bartow County Jail.  (Id. at 32.)  Deputy Fleming conducted the transport in a marked vehicle.  (Id. at 32, 58.)  Upon his arrival at the Bartow County Jail, Mr. Somers was likely booked in and then placed in a holding cell.  (Id. at 32-33, 58.)

14

**F.      Interview of Mr. Somers at the Jail**

Given the ages of the children in Mr. Somers's home, and given the ages of the children listed in the file names viewed on his home computer, officers believed it would be prudent to have the Children's Advocacy Center in Cartersville conduct forensic interviews of the children. (Tr. 33.) During those interviews, the children disclosed a history of what the interviewers deemed to be inappropriate sexual contact between them and Mr. Somers. (Id.)

SA Owens thus elected to ask to speak to Mr. Somers again at the Jail. (Tr. 33.) Mr. Somers agreed to speak again to the agents and was taken to an interview room at about 12:42 p.m. (Id. at 33, 59.)[11] The interviewers were not armed, and no promises or threats were made to Mr. Somers. (Id. at 34.) SA Owens did not issue Miranda warnings a second time but reminded Mr. Somers that those had been discussed with him earlier and that they still applied. (Id. at 34-35, 62-63.) At some point, agents asked Mr. Somers for the passcode for his cellphone, which he provided. (Id. at 35-36.) Mr. Somers eventually stated that he wanted to stop talking, and he asked for an attorney. (Id. at 35.) After the defendant made that

_____

[11] Audio and video recordings were made of this interview. (Tr. 34; see also Gov't Ex. 2.) Mr. Somers's hands were shackled to a wrist chain and his feet were shackled. (Tr. 58-59.)

statement and request, GBI SA Greene asked Mr. Somers if he would take a polygraph.  (Id.)  He said that he would not, and SA Owens ended the interview. (Id.)[12]

### G.   Search Warrant for Defendant's Cellphone

Investigator LaFrance thereafter sought and obtained a search warrant for the defendant's cellphone from a Bartow County magistrate on July 22, 2019.  (Tr. 36; see also Gov't Ex. 10 [31-7].)  Agents unlocked the cellphone using the pass code defendant had provided earlier and searched it.  (Tr. 59-60.)

## II.   THE INDICTMENT

On March 4, 2020, the grand jury returned a three-count Indictment [1] against defendant, charging him with distribution of child pornography (in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1)); receipt of child pornography (in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1)); and possession of child pornography (in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2)).  The Indictment also contains a forfeiture provision.

---

[12] The Government represents that it will not seek to admit in its case-in-chief either GBI SA Greene's final question regarding the polygraph or Mr. Somers's response.  (Gov't Resp. [38], at 10, 22.)  Thus, defendant's assertion that this question and answer should be suppressed (Def.'s Br. [37], at 14) is moot and will not be addressed further herein.

### III.   **PARTIES' CONTENTIONS**

Mr. Somers argues that all statements he made were the product of his illegal arrest and must be suppressed.  He contends that there was no legitimate basis for his detention in front of his home and that there was no probable cause for his arrest. Finally, he argues that all evidence obtained from his cellphone must be suppressed because it was seized during his illegal arrest.  (See generally Def.'s Br. [37].)

The Government responds that Mr. Somers's detention was proper as he was in the immediate vicinity of a property subject to a lawful search warrant.  Further, there was at least reasonable suspicion of criminal activity to separately justify Mr. Somers's detention.  Thus, his subsequent statements were not the product of an illegal detention.  With regard to the cellphone, the Government asserts that its seizure was covered by the scope of the search warrant for 19 Corinth Road and thus was proper.  Notwithstanding that search warrant, the Government contends that there was also probable cause to believe the cellphone contained evidence of a crime; therefore, a warrantless seizure was permitted and was followed shortly thereafter with a second warrant.  (See generally Gov't Resp. [38].)

## IV.   ANALYSIS

### A.   There is No Basis to Suppress Mr. Somers's Statements

Mr. Somers was lawfully detained incident to the execution of the search warrant at his residence.  See Michigan v. Summers, 452 U.S. 692, 704-05 (1981) ("If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.").  Officers need not have a specific suspicion that a detainee is involved in criminal activity or poses a danger to them; the power to "'detain incident to a search is categorical.'" Bailey v. United States, 568 U.S. 186, 193 (2013) (quoting Muehler v. Mena, 544 U.S. 93, 98 (2005)). Given these authorities, this Court has made the following observation:

> The Summers exception has been treated as a broad, categorical rule in the Eleventh Circuit.  Gomez v. United States, 601 F. App'x 841, 846-47 (11th Cir. 2015); Sampson v. City of Brunswick, 549 F. App'x 858, 860 (11th Cir. 2013) (explaining that the Supreme Court has held "that police officers have a 'categorical' right to detain occupants of a premises while executing a search warrant for contraband"); Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.9(e) (5th ed. 2018) (explaining that the standardized procedure permitted by Summers allows police to always detain persons found at the premises named in a search warrant for the search of contraband provided the persons detained are occupants). . . . The duration of such a detention extends for the whole length of most warranted searches.  Croom v. Balkwill, 645 F.3d 1240, 1250 (11th Cir. 2011).

United States v. Mitchell, No. 1:17-CR-122-LMM-LTW, 2019 WL 6462838, at *11 (N.D. Ga. June 25, 2019), R&R adopted, 2019 WL 3854307 (N.D. Ga. Aug. 16, 2019).

Such detentions during execution of a search warrant are justified on the grounds of (1) officer safety, (2) facilitating the completion of a search, and (3) preventing flight.  Summers, 452 U.S. at 702-703.  Each interest was implicated here.  First, Mr. Somers could have jeopardized officer safety from his location.  As Agent Owens explained, he was close by both his home and his vehicle, either of which could contain a weapon.  (In fact, Mr. Somers had both a gun and a knife in his Corolla.)  Second, from his location, Mr. Somers could have interfered with the execution of the search warrant, hidden evidence, sought to distract the officers, or simply gotten in the way.  Third, from his location, Mr. Somers could have fled the scene.

One limitation on this broad authority is that police must encounter the individual detained either within the residence to be searched or in its "immediate vicinity."  Bailey, 568 U.S. at 199 ("The categorical authority to detain incident to the execution of a search warrant must be limited to the immediate vicinity of the premises to be searched.").  The Court did not define a rule, but noted that courts

should consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, and the ease of re-entry from the occupant's location. Id. at 201.

The Court agrees with the Government that the first Bailey factor, whether Mr. Somers was within the "lawful limits" of his home, is not entirely clear. Mr. Somers lives in a townhome, with a driveway that goes directly to the front door and is wide enough for two side-by-side parking spaces. The driveway is contiguous with the driveway for the unit next-door, and there is a small shared street and parking area. When SA Owens told Mr. Somers to stop, he was standing several feet from the Corolla, which was parked at the end of the driveway, behind one of his vehicles and along the curb area. Thus, he may have been standing on his portion of the driveway, or he may have been standing on the driveway portion technically assigned to a neighbor or at the beginning of the street. But even assuming he was not precisely on the "lawful limits" of his unit, he would have been standing immediately adjacent; he was certainly not about one mile away from the residence as was the defendant in Bailey, 568 U.S. at 190, whose detention that far from the residence was held unlawful. Further, the other two Bailey factors support the lawfulness of the detention here. Mr. Somers was "within the line of

20

sight" of the home and he could have easily re-entered the home from his location. Application of the <u>Bailey</u> factors compels the conclusion that Mr. Somers was in the immediate vicinity of his townhome when he was stopped and handcuffed; thus, his detention was lawful.[13]  It was not, as Mr. Somers's asserts, a *de facto* arrest. (Def.'s Br. [37], at 12.)

Accordingly, there is no basis to use Mr. Somers's lawful detention as grounds to suppress any of his subsequent statements.[14]  Indeed, officers did not question Mr. Somers for the first time until <u>after</u> he was released from handcuffs and his brief detention was over.  He was informed that he was not under arrest and could leave, and he was given notice of his <u>Miranda</u> rights, both orally and in writing.  After absorbing all of this information, Mr. Somers knowingly and voluntarily agreed to speak to the officers.[15]

---

[13] The detention was brief.  Defendant estimates that it lasted from 6:15 a.m. until 6:27 a.m., or about 12 minutes.  (Def.'s Br. [37], at 13.)

[14] Given the clear legality of the detention here under <u>Summers</u> and <u>Bailey</u>, the Court need not address the Government's second contention—that officers had reasonable suspicion of illegal activity by Mr. Somers so as to authorize his temporary detention under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  (<u>See</u> Gov't Br. [38], at 15-16.)

[15] Similar analysis applies to the second interview of Mr. Somers, which occurred post-arrest at the Bartow County Jail.  He voluntarily agreed to speak to officers.  There is no basis to suppress any of those statements he made in this

Following his questioning, the questioning of his wife, and the preview of the home computer, officers arrested Mr. Somers.  Defendant asserts that there was not probable cause for the arrest.  The government bears the burden to demonstrate the legality of a warrantless arrest.  Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Tobin, 923 F.2d 1506, 1521 & n.21 (11th Cir. 1991).  A warrantless arrest is constitutionally valid only when there is probable cause to arrest.  See United States v. Watson, 423 U.S. 411, 417 (1976); United States v. Costa, 691 F.2d 1358, 1361 (11th Cir. 1982) (per curiam).  "Probable cause exists if, at the moment the arrest was made, the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense."  Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003) (internal quotation marks and citation omitted).

However, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Adams v. Williams, 407 U.S. 143, 149 (1972).  In determining whether probable

_____

second interview, except for the question and answer about defendant's willingness to take a polygraph, discussed supra note 12.

cause exists, the Court "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)).

"[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks and citations omitted). An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for the decision to make the arrest. Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla., 956 F.2d 1112, 1119 n.5 (11th Cir. 1992); United States v. Pantoja-Soto, 739 F.2d 1520 (11th Cir. 1984).

Under these standards, it is not difficult to conclude that probable cause existed for Mr. Somers's arrest. Based on the investigation to date, including the download of 11 files of child pornography from a device using the Somers's IP address, statements from Mr. and Ms. Somers regarding their respective uses of their computer, Ms. Somers's statement that her husband took pictures of her children naked, and the evidence found during the forensic preview of the

23

computer—particularly the files with titles indicating child sex abuse material—there was probable cause to arrest Mr. Somers.  The facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that Mr. Somers had committed an offense.  See Holmesa, 321 F.3d at 1079.

**B.      There is no Basis to Suppress Evidence from Mr. Somers's Cellphone**

The Court deals initially with the seizure of the defendant's cellphone.  As noted above, the Government argues that the seizure of the cellphone was authorized by the search warrant, as that device had been inside the residence and within its curtilage when initially seized.  The Court agrees.

The search warrant listed "cellular telephones" as among the items that could be seized from the residence.  (See Gov't Ex. 8 [31-5], at ¶ 12.)  Mr. Somers's cellphone had been inside the residence until he carried it outside as he walked to his car to leave for work.[16]  The issue then is whether Mr. Somers was within the

---

[16] The Government is likely correct that Mr. Somers could not remove his cellphone—an item otherwise authorized to be seized—from the scope of the search warrant by simply carrying it outside after agents arrived.  Otherwise, the Government asserts, a defendant could remove evidence from the bounds of a search warrant by simply running away with it when agents arrive.  (Gov't Resp. [38], at 18-19.)  While the Court may agree with that argument in theory, there is

curtilage of his home (thus making his cellphone subject to the search warrant) when he encountered SA Owens.

The area adjacent to the home and to which the activity of home life extends, such as a front porch, side garden, or area outside the front window, is properly considered curtilage.  See Collins v. Virginia, __ U.S. __, 138 S. Ct. 1663, 1671 (2018).  According to United States v. Dunn, 480 U.S. 294 (1987), the task of defining the extent of a home's curtilage is resolved with particular reference to four factors:  (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.  Id. at 301.

Although the driveway here was not behind a fence or protected from public view (factors two and four), the first and third Dunn factors weigh in favor of finding that Mr. Somers was within the curtilage of his residence when he encountered SA Owens.  As discussed above, Mr. Somers was walking away from his front door, down the driveway, and had not yet reached his car parked along the

---

no evidence that Mr. Somers knew that agents were lying in wait and thus took his cellphone outside so it could not be seized pursuant to a search warrant he knew nothing about.

curb immediately behind the driveway.  The location where SA Owens confronted the defendant was in close proximity to the residence.  As for factor three, the driveway is immediately adjacent to the door of the residence, it is was not very long, and it extends slightly over the length of one car.  The driveway was not set up for public use or parking by anyone other than the occupants of the townhome.  The undersigned thus reports that Mr. Somers was still in the curtilage of his home when he was stopped by law enforcement.

There is another compelling reason why the seizure of the cellphone was lawful.  As already discussed, SA Owens had probable cause to arrest Mr. Somers.[17]  The law is clear that agents could seize Mr. Somers's cellphone incident to his lawful arrest.  See Riley v. California, 573 U.S. 373, 388 (2014) ("Both [defendants] concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant.  That is a sensible concession."); United States v. Reilly, No. 1:14-CR-146-ODE-GGB, 2015 WL

_____

[17] Mr. Somers's cellphone was not searched incident to his lawful arrest—it was seized.  See Horton v. California, 496 U.S. 128, 133 (1990) ("The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures.  A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property.").  A search of his cell phone occurred later pursuant to a warrant.

4429415, at *12 (N.D. Ga. July 20, 2015) ("[Defendant] was lawfully arrested, and agents are permitted to seize cell phones pursuant to a lawful arrest"); United States v. Robinson, No. 1:05-CR-477-13-CC, 2007 WL 9725266, at *1 (N.D. Ga. Jan. 26, 2007) ("cell phone was lawfully seized incident to Defendant's arrest").

The fact that agents seized the cellphone a short time before actually arresting Mr. Somers is immaterial. The seizure was incident to a virtually contemporaneous lawful arrest. See United States v. Rowe, No. 2:18-CR-123-WKW, 2018 WL 3448483, at *4 (M.D. Ala. June 20, 2018), R&R adopted, 2018 WL 3448225 (M.D. Ala. July 17, 2018) ("while Sergeant Dunn took Rowe's cell phone from him before arresting him for safety reasons, this seizure was incident to Rowe's arrest because it is not 'particularly important that the search precede[s] the arrest rather than vice versa' when a formal arrest occurs shortly after the search and seizure") (quoting Rawlings v. Kentucky, 448 U.S. 98, 111 (1980)).

Defendant is charged with distribution of child pornography, receipt of child pornography, and possession of child pornography. Thus, his cellphone could be seized from his person for evidentiary purposes, as illegal images could have been stored there. See Carroll v. United States, 267 U.S. 132, 158 (1925) ("When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense

may be seized and held as evidence in the prosecution."); United States v. Ortiz, 84 F.3d 977, 982-84 (7th Cir. 1996) (officers making valid arrest were authorized to seize a suspected heroin supplier's pager containing an electronic telephone directory in order to prevent destruction of potential evidence).

Although it is lawful to seize items like cellphones based on probable cause to believe that they contain contraband, a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable seizures. United States v. Jacobsen, 466 U.S. 109, 121–22 (1984). A temporary warrantless seizure supported by probable cause is reasonable as long as "the police diligently obtained a warrant in a reasonable period of time." Illinois v. McArthur, 531 U.S. 326, 334 (2001).

The delay here between seizing the cellphone and obtaining a warrant to search it was only three days. This is far less than the time lapse found reasonable in other cases. See United States v. Laist, 702 F.3d 608, 616 (11th Cir. 2012) (25-day delay in obtaining a search warrant for a computer was reasonable)[18]; see also

_____

[18] The seminal Laist decision makes clear that there is no bright-line rule concerning how long of a delay is unreasonable. To the contrary, the case

Thomas v. United States, 775 F. App'x 477, 489 (11th Cir. 2019) (per curiam) (33-day delay in obtaining a search warrant for a computer was reasonable); and United States v. Atkins, 702 F. App'x 890, 896 (11th Cir. 2017) (per curiam) (30-day delay in obtaining a warrant to search a cellphone was reasonable).  Accordingly, the undersigned reports that the three-day delay here between the seizure of Mr. Somers's cellphone and the Government's application for, and receipt of, a warrant authorizing its search was reasonable.

Finally, with regard to the search of the cellphone, Investigator LaFrance obtained a warrant to search it from a state magistrate.  Defendant makes no challenge to the magistrate's finding that probable cause existed to issue the search

---

emphasizes the very case-specific nature of this analysis and identifies a number of factors that courts should consider in their balancing of the government's and defendant's interests.   Those factors include:   (1) the significance of the interference with the defendant's possessory interest, (2) the duration of the delay, (3) whether the defendant consented to the seizure, (4) the government's legitimate interest in holding the property as evidence, and (5) the government's diligence in pursuing a search warrant.  Laist, 702 F.3d at 613-14.  The government's diligence, in turn, can be measured by a number of considerations, which may include:  (1) the nature and complexity of the investigation, (2) whether "overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case", (3) the quality of the warrant application and the amount of time it should take to prepare it.  These factors "are by no means exhaustive."  Id. at 614. Defendant fails to argue any of these factors in his brief.

warrant.  Therefore, there is no basis to challenge the search of the cellphone, and nothing found therein should be suppressed.

V.      **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements and Phone [20], as amended [28] be **DENIED**.

**SO RECOMMENDED**, this 6th day of January, 2021.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE